# MARTZELL *against* STAUFFER.

## IN ERROR.

Where under the provisions of a will, a trustee was appointed to whom a fund was paid, the interest of which only was payable to the *cestui que trust* for his maintenance, and the trustee mismanaged the fund, was guilty of a breach of trust, and was likely to become insolvent, an action of *indebitatus assumpsit* in the name of the *cestui que trust* will lay against him. The object of the suit however is to preserve the fund; to prevent waste, mismanagement and fraud on the part of the trustee, and this only by laying hands on the money and placing it at the disposal of the court; which may be done by controlling the process of the court, by an order endorsed on the execution, directing the sheriff to bring the money into court. Or the court may enter a special judgment.

It is competent in such action for the plaintiff to prove that the executor of the will, who had appointed the trustee, by virtue of it, had assented to the suit.

The act of the 29th of March, 1823, does not embrace the case of a trust created by will.

ERROR to the district court for the city and county of *Lancaster.* This was an action of *indebitatus assumpsit* for money had and received, brought by *Philip Martzell* against *Christian Stauffer*, to recover from the defendant a sum of money, which he had received for the plaintiff, as a trustee, appointed under the will of *Wendal Martzell*, deceased, which so far as it related to this case was as follows:

"Item. It is my will that my two sons *John* and *Christian* shall buy a piece of land for my son *Philip*, with necessary buildings of the value not less than five hundred pounds, but with the said *Philip's* consent, and they shall help him with farming utensils, horses, cows, wagon, and such other articles that he would want to cultivate his land, if bought; but the title (if any land so bought) shall be made to his children, and their heirs and assigns forever. He shall and may live on it, and draw all income of it during his life, but no deed shall be made to him as aforesaid.—Item. It is my will that there shall be always a certain person appointed by my executors who shall have the sole care of him and his property. Should it be considered more advantageous to him, and his children not to buy land, then the money shall be put out upon interest, or my sons *John* and *Christian* may keep it upon interest and pay him as much of the interest as may be necessary for his maintenance. But if my son *Philip* should at any time after some years' trial, appear a sober industrious person, to the satisfaction of my sons *John* and *Christian*, and the man so appointed to take care of him and his property, then they may pay his share to himself, or as might be thought best."

The testator appointed *John Martzell* and *Abraham Reist* executors of his will. It was dated on the 22d day of January, 1804, and was proved on the 4th day of March following. *Christian*

(Martzell *v.* Stauffer.)

and *John Martzell* died before the year 1811.   On the first of A-
pril, 1818, *Abraham Reist,* the surviving executor of *Wendel
Martzell,* by an instrument in writing, appointed *Christian Stauf-
fer,* the defendant, as guardian of *Philip Martzell,* under the will
of *Wendal Martzell,* and one *Samuel Ensminger,* a former
guardian, paid to *Stauffer* two thousand three hundred and ninety
dollars, the trust fund which had been in his hands.   This suit
was commenced on the 27th of October, 1823. *Philip Martzell*
died after this suit was brought, and *John Levering* his administra-
tor was substituted.   On the trial of the cause the plaintiff offered
to prove by *Abrahom Reist,* that before this suit was brought,
he, so far as he had either interest or control in the matter, or had
consent to give, had consented that this suit should be instituted,
knowing that if a judgment or lien were not obtained against the
defendant, the money in his hands would be lost.   The defendant
objected to this evidence, and it was rejected by the court, and a
bill of exceptions taken by the plaintiff.   It appeared in evidence
that the defendant was largely in debt before the suit was brought,
that *he then kept a store and tavern,* and had considerable proper-
ty; but *although in good credit with some men,* with others he was
in bad credit, and that on the 17th of June, 1825, he executed a deed
of assignment for the benefit of his creditors, under which an as-
signee's account was settled, by which a balance of upwards of
three thousand dollars only appeared to be applicable *to his debts*
of the first class in the deed of assignment, which amounted to more
than seventeen thousand dollars.   The plaintiff also proved that af-
ter his suit was brought, the defendant said he did not much care
whether he gained or lost it, he would keep it in court until the
estate was spent.   It appeared also that the plaintiff lived with a
relation of his, and continued to be intemperate until the time of
his death, and that the defendant had taken no care of him.   No
land had been purchased for him under the will of his father.

The district court charged the jury that the plaintiff was not en-
titled to recover, and error was assigned in this, and in the bill of
exceptions to evidence.

The cause was argued by *Champneys* for the plaintiff in error,
and by *Montgomery* and *Jenkins* for the defendant in error.

The opinion of the court was delivered by

Rogers, J.—*Wendal Martzell,* made his last will and testa-
ment, and among other matters devised as follows: Item. It is my
will that my two sons, *John* and *Christian,* shall buy a piece of
land for my son *Philip,* with the necessary buildings, of the value
not less than five hundred pounds, and with the said *Philip's* con-
sent, and they shall help him with farming utensils, horses, cows,
wagon, and such other articles, that he would want, to cultivate

the land, if bought; but the title, (if any land is bought,) shall be made to his children, and their heirs and assigns forever.    He shall and may live on it, and draw all the income of it, during life, but no deed shall be made to him, as aforesaid.

Item. It is my will, that there shall be always, a certain person appointed by my executors, who shall have the sole care of him, and his property.    Should it be considered, to be more advantageous for him and his children, not to buy land, then the money shall be put out upon interest, or my sons, *John* and *Christian*, may keep it upon interest, and pay him as much of the interest as may be necessary for his maintenance.    But if my son *Philip*, should at any time after some years trial, shall appear a sober, industrious person, to the satisfaction of my sons, *John* and *Christian*, and the man so appointed to take care of him and his property, then they may pay his share to himself, or do as might be thought best.                        •

The testator appointed *John Martzell* and *Abraham Riest* executors.    *John Martzell* and *Christian Martzell* the sons, are dead; *Abraham Riest* is the surviving executor.    In pursuance of the power in the will, (and this we think a good execution of the power,) *Abraham Riest*, the surviving executor, appointed in the first instance *Samuel Ensminger*, guardian and trustee of the person and estate of *Philip*, and afterwards, by a subsequent arrangement, appointed the defendant, *Christian Stauffer*. *Christian Stauffer* received in money and goods, (which the jury would have been warranted in finding, were afterwards converted into money,) two thousand three hundred and ninety dollars.    The plaintiff offered to prove, (and in giving judgment in this cause we must take it proved,) that *Christian Stauffer* was in failing circumstances at the time suit was commenced, and that he afterwards assigned all his property for the benefit of certain preferred creditors.    The plaintiff also proved, that *Stauffer* declared that he did not care much whether he gained the suit or not. He would keep it in court, until the whole estate was spent.    No land was purchased by the sons for *Philip's* use.    It was fully proved, that *Philip* continued an habitual drunkard, until his death. This is an action of *indebitus assumpsit*, brought by the *cestui que trust*, against an insolvent and fraudulent trustee, and the question is, whether in *Pennsylvania*, the fund under such circumstances may be recovered.    If we had a Court of Chancery, the remedy would be plain.    It is a settled principle of that court, that an executor or other trustee, who mismanages or puts the assets in jeopardy by his insolvency existing or impending, should be prevented from further interfering with the estate, and that the funds should be withdrawn from his hands. *Elmendorf* v. *Lansing*, 4 *John. C. R.* 565.    *Monell* v. *Monell*, 5 *John. C. R.* 296.

*Batten* v. *Earnley,* 2 *P. Will.* 162. *Utterson* v. *Main,* 3 *P. Will.* 334. 4 *Brown.* 277. It is the common practice of the Court of Chancery, to compel the insolvent or fraudulent trustee, to give security, or to bring the money into court, and where that is done the court appoints a receiver.    The fund in the hands of the receiver, abides the further order of the court.    In a case such as the present, a Court of Chancery would, without hesitation, compel *Stauffer* to bring the money into court.    If the evidence is to be believed, he has grossly and fradulently mismanaged the fund, and has been guilty of a wanton and wilful breach of trust. · In *Batten* v. *Earn-ley,* a case in some respects like the present, the Chancellor in the case of an executor, because he had expressed himself in words, threatening to defeat an annuity, directed the master to see a sufficient part of the personal estate, in the hands of an executor, set apart and assigned to a trustee, in trust to secure the annuity.  All the cases show, and particularly the one just cited, the control which that court uses to prevent the mismanagement and abuse of trust, when there is good reason to believe that mismanagement or abuse is intended.    As then, we have no Court of Chancery, we are obliged from necessity, and to prevent a failure of justice, to resort to our common law action, which, although a less direct and a more clumsy mode has been made effectual in many cases, to affect equitable relief.    This suit can be sustained on equitable principles, and those principles, although we are destitute of a court, whose peculiar business it is to give them effect, have been recognized, and engrafted into our system of jurisprudence, from the earliest decisions of which any note has been taken.    It is almost useless to enumerate instances of the kind.    They are familiar to all in the least acquainted with the jurisprudence of the state. Many of them have been mentioned in *Bixler & wife* v. *Kunkle,* 17 *Serg. & Rawle,* 298.    These rules, as is there said by Justice *Tod,* who delivered the opinion of the court, have become rules of property.    The principle I take to be this: *Equitable relief has been invariably granted, when it can be done consistently with the forms known to the common law.*

· In *Pennsylvania,* says Chief Justice *Tilghman,* in *Cope* v. *Smith's executors,* 8 *Serg. & Rawle,* 115, the court hold themselves bound to administer equity, *in all cases, where the forms of law do not restrain them.*    In the action of ejectment, for instance, which is very little trammeled by form, they consider that as done, which a court of equity would decree to be done.    They will permit a purchaser of land to recover it from the seller, when he has paid all the purchase money, according to the contract or tendered it, and brings it into court.    So in an action on the bond, they will permit the obligor to make any plea which would entitle him to relief in equity.    These principles have been engrafted in

(Martzell *v.* Stauffer.)

the juridical code of this state, from time to time, and were, in truth, indispensable to prevent a failure of justice. *Brown* v. *Furer*, 4 *Serg.* & *Rawle*, 217.    Here the action is *indebitatus assumpsit*, which is as little trammeled by form, as an ejectment. The remedy is in the nature of a bill in chancery, and may well be made a means of withdrawing a fund from a fraudulent trustee, without doing violence, either to the form or the principles of the action.    Sir *William Blackstone*, in speaking of a Court of Chancery, says, in these early times, the chief judicial employment .of the Chancellor, must have been in devising new writs, directed to the Courts of Common Law, to give remedy in cases where none was before administered.    And to quicken the diligence of the clerks in Chancery, who were too much attached to ancient precedents, it is provided by *Statute West.* 2, 13 *Eliz.* 1. *c.* 24, that, whensoever, from thenceforth, in one case a writ shall be found in Chancery, and in a like case falling under the same right and requiring like remedy no precedent of a writ can be. produced, the clerks in Chancery shall agree in forming a new one, and if they connot agree, it shall be adjourned to the next Parliament, when a writ shall be framed by consent of the learned in the law, lest it happen, that the court of our lord the king, be deficient in doing justice to the suitors.    And this accounts for the great variety of writs of trespass on the case, to be met with in the register; whereby the suitor had ready relief, according to the exigency of his business, and adapted to the special reason and equity of his very case.    Which provision, says the excellent commentator, (with a little accuracy in the clerks of the Chancery, and a little liberality in the judges, by extending rather than narrowing, the remedial effects of the writ,) might have effectually answered all the purposes of a court of equity, except that of obtaining a discovery by the oath of the defendant.    And this was also the opinion of *Fairfax*, who is said to have been a very learned judge, in the time of *Edward the* 4*th*, and the opinion derives strength by the fact, that the distinction between law and equity, as administered in different courts, is not at present known, nor does it seem ever to have been known, in any other countries, at any time, except *England*, and some of the states of this Union.  As we have no clerk in Chancery it is the duty of the courts themselves, so to fashion our remedies, as to administer relief to suitors, according to the exigency of their business, and adapted as near as may be, without violence to the forms and boundaries of action, to the specialty, reason and equity of his very case.    And unless some liberality is shown by the courts, in this respect, we must give up the boast of the Common Law, that there is no wrong without a remedy, as this case most fully shows.    If as has been contended here, where there is a right, as Chief Justice *Tilghman* says, in *Brown* v. *Furer*, 4

(Martzell *v.* Stauffer.)

*Serg. & Rawle,* 217, we must not suffer it to be said, that there is no remedy, (and this, it must be remembered, seems to have been the grounds of the decision of the District Court,) the fund went necessarily into the hands of the *cestui que trust,* it would be difficult to answer the objections, that a recovery would defeat the intention of the testator, as it is manifest he wished to prevent *Philip* controlling the fund, unless his habits were materially changed.   The object of the suit, however, is to preserve the fund. To prevent waste, mismanagement and fraud, on the part of the trustee, and this only can be done by laying hands on the money, and placing it at the disposal of the court, and this may be effectually done by controlling the process of the court, by an order endorsed on the execution directing the sheriff to bring the money into court, in compliance with the mandate of the writ.   The court might enter a special judgment, which, perhaps, would be the better way, or merely control the execution of the writ, and which ever way is thought the most advisable, the effect will be the same.

The bill in Chancery is in the name of the *cestui que trust,* and so here, in analogy to the Chancery remedy, may be brought by him, especially when the executor, who has the power of appointing the guardian, under the will, assents to the suit.   It has been asked, what power has the court over the money, after it is recovered, what disposition can they make of it? and this, I confess, is the most difficult part of the case.   I, however, consider that the objection is in some measure obviated by the particular circumstances of this case.   The recovery of the fund from the trustee, virtually discharges him from the duties as trustee, and leaves the power of appointing another trustee (under the direction of the court,) to the surviving executor.   When the money is recovered and an appointment made, he will be entitled to receive, under the orders of the court.   Whether the court would have a general power to appoint a trustee, a receiver, to manage the fund, according to the directions of the will, I give no opinion, because, I have no opinion to give, and it is not necessary at this time, to form one. It would be a reproach to our system of jurisprudence, if a wrong, such as this, admitted of no remedy, and this would be the case, unless the action can be supported; and this leads me to consider the argument drawn from the act of 29th March, 1823.   It is said that the legislature has in that act given ample remedy to the *cestui que trust,* and if this were so I acknowledge it would be an argument, difficult to answer, as this action can only be defended upon the ground that it is necessary to prevent a failure of justice.   I have looked into the act, with an anxious desire to find that it embraced the case of a trust created by will, but I cannot bring myself to believe, that the legislature intended to embrace it.   It would not

(Martxell *v.* Stauffer.)

seem to me, that a case, such as the present, was in their contemplation, but extends only to trusts created by conveyance, assignment or transfer. It would be doing violence to language, to extend the construction so as to embrace a trust created by will. The legislature have, from time to time, invested the courts with certain specific chancery powers. The act of the 24th of March, 1818, gave an adequate remedy against the assignee or trustee, under the act for the relief of insolvent debtors, and the assignees, under a voluntary or compulsory assignment. The act had reference principally to an assignment by debtors, in failing circumstances, which has become very common in *Pennsylvania,* by which a legal preference is mostly given to creditors, for whose benefit the assignment is made. Further to extend the remedy, they passed the act of the 29th of March, 1823, in which a more prompt and summary remedy is given in certain cases specified, but which cannot be made fairly to include trusts created by will, and I do not feel myself at liberty to supply an omission, either designed or accidental. Had it occurred to the members of the legislature, that a more prompt and summary remedy was wanted in cases of such trust, I have no doubt they would have been included. But there is no reason why we should extend the operation of the act further than the words and the intention of the legislature will fairly warrant. If the legislature would at once vest full power in the courts, in all cases of trust, and also include cases of fraud and accident, it would prove a most salutary and beneficial change, but until this is done, we must continue to administer equitable relief, under the common law form, so as to attain justice, and prevent injustice and fraud.

We are of opinion, that the plaintiffs had a right to shew the insolvency of *Christian Stauffer,* and that *Abraham Riest* assented to the suit. We are also of the opinion, that the exception to the charge has also been sustained. Other points were mentioned in the argument, which it is immaterial to notice, as it is believed that these principles embrace the whole case.

Judgment reversed and a *venire de novo* awarded.